## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

**MONICA MITCHELL, ET AL.**                          **CIVIL ACTION**

**VERSUS**                                            **NO. 19-13298**

**PARISH OF JEFFERSON, ET AL.**                       **SECTION H**

## ORDER AND REASONS

Before the Court is a Motion for Summary Judgment (Doc. 43) filed by Defendants Jefferson Parish and Jefferson Parish Fire Department. For the following reasons, this Motion is **GRANTED**.

## BACKGROUND

Three female fire dispatchers say that a local fire department discriminated against them on the basis of sex and then retaliated against them for exposing a male supervisor's sexual harassment of female employees. This lawsuit followed.

1

The plaintiffs, Monica Mitchell, Melissa Burkett, and Tammy Cavanaugh, are veteran dispatchers for the Jefferson Parish East Bank Consolidated Special Service Fire Protection Bureau. They work in the Emergency Communications Division, known as "Fire Alarm." They do what their job title suggests: answer emergency calls and direct the response of fire personnel. Robert Funk leads Fire Alarm and holds the title of Fire Communications Supervisor. He reports to the Bureau's Chief, David Tibbetts.

For years, Funk has allegedly denied female employees the training and equipment he provides male employees. The plaintiffs say this discrimination has stunted their professional growth and put their otherwise automatic promotions at risk. Fire Alarm's female dispatchers allegedly lack the training and equipment they need to do jobs for which they are otherwise qualified.

But sex discrimination is just one reason the Bureau is an allegedly unpleasant workplace – pervasive sexual harassment is another. For years, the plaintiffs say, Funk has taken female dispatchers off-premises for extended periods of time, leaving Fire Alarm inadequately staffed.[1] Funk has also allegedly "grant[ed] perks" to dispatchers who accept his advances.[2]

After Funk made one particularly "inappropriate and unwanted" advance (albeit not to any of these plaintiffs), Mitchell and Burkett allegedly complained to then-Chief Joseph Greco.[3] Funk learned of the complaint and allegedly retaliated against Mitchell and Burkett in various ways: "subjecting

---

[1] Doc. 1 at 6.
[2] Id.
[3] Id.

them to hostile, intimidating language," including "misogynistic and racial slurs"; "continuing to deny them necessary training and resources"; and "selectively enforcing Bureau policies on mandatory overtime and emergency/sick leave in a punitive manner."[4]

Tibbetts succeeded Greco as Fire Chief. Hoping the new chief would do what his predecessor would not, the plaintiffs told Tibbetts about Funk's misconduct and urged him to investigate. He declined.[5] So, they filed complaints with the Equal Employment Opportunity Commission.[6] In response, Tibbetts and Funk allegedly initiated "malicious and baseless disciplinary proceedings" against Burkett.[7] Threats followed. According to the plaintiffs, Tibbetts said he would strip Fire Alarm employees of civil service protections if they continued to exercise their rights under Title VII.[8]

Aiming to secure those rights, the plaintiffs sued Jefferson Parish and the Bureau.[9] Upon a motion to dismiss for failure to state a claim, claims for First Amendment retaliation and punitive damages were dismissed with prejudice.[10] Now before the Court is defendants' motion for summary judgment as to plaintiffs' remaining claims, which include claims for discrimination under Title VII and Louisiana Employment Discrimination Law (LEDL) as

---

[4] Id. at 7.
[5] Id. at 8.
[6] Id.
[7] Id.
[8] Id.
[9] Plaintiffs also named David Tibbetts and Robert Funk as Defendants in their initial complaint. Doc. 1. Claims against these Defendants were dismissed with prejudice two years ago. Doc. 17.
[10] Doc. 17.

well as claims for a hostile work environment and retaliation under Title VII.[11] Generally, defendants argue that plaintiffs fail to meet their burden under the appropriate standards governing each claim. Plaintiffs oppose.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[12] A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[13]

In determining whether the movant is entitled to summary judgment, the Court views facts in the light most favorable to the non-movant and draws all reasonable inferences in her favor.[14] "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial."[15] Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case."[16] "In response to a properly supported motion for summary judgment, the non-movant must

---

[11] Doc. 43.
[12] Sherman v. Hallbauer, 455 F.2d 1236, 1241 (5th Cir. 1972).
[13] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).
[14] Coleman v. Houston Indep. Sch. Dist., 113 F.3d 528, 532 (5th Cir. 1997).
[15] Engstrom v. First Nat'l Bank of Eagle Lake, 47 F.3d 1459, 1462 (5th Cir. 1995).
[16] Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim, and such evidence must be sufficient to sustain a finding in favor of the non-movant on all issues as to which the non-movant would bear the burden of proof at trial."[17] "We do not . . . in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[18] Additionally, "[t]he mere argued existence of a factual dispute will not defeat an otherwise properly supported motion."[19]

## LAW AND ANALYSIS

A showing of discrimination under Title VII or the LEDL requires direct or circumstantial evidence of discrimination.[20] Plaintiffs do not appear to have made a showing of direct evidence, so they must rely on circumstantial evidence of discrimination. Such a showing requires four things: "[a plaintiff] must establish that he (1) is a member of a protected class; (2) was qualified for the position; (3) was subject to an adverse employment action; and (4) … in the case of disparate treatment, … that other similarly situated employees were treated more favorably."[21] Defendants do not contest that the plaintiffs, who are all female, are members of a protected class and likewise do not contest that the plaintiffs are qualified for (a) their current positions and (b) the next

---

[17] John v. Deep E. Tex. Reg. Narcotics Trafficking Task Force, 379 F.3d 293, 301 (5th Cir. 2004) (internal citations omitted).
[18] Badon v. R J R Nabisco, Inc., 224 F.3d 382, 394 (5th Cir. 2000) (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)).
[19] Boudreaux v. Banctec, Inc., 366 F. Supp. 2d 425, 430 (E.D. La. 2005).
[20] Russell v. McKinney Hosp. Venture, 235 F.3d 219, 222 (5th Cir. 2000).
[21] Bryan v. McKinsey & Co., 375 F.3d 358, 360 (5th Cir. 2004) (citation omitted).

positions along the automatic promotion path.[22] Thus, a showing of *prima facie* discrimination depends entirely on showing of an adverse employment action and a showing of disparate treatment.

## I. Adverse Employment Action

"It is … well established … that the denial of a promotion is an actionable adverse employment action."[23] In this case, however, the plaintiffs have not been denied a promotion. In fact, it is undisputed that they cannot properly be denied the promotions for which they are next eligible, as all three plaintiffs have passing scores for the next role above theirs.[24] All three, moreover, are in positions for which any promotion will be determined solely by seniority (assuming a passing test score) and not by discretion or merit.[25] There is no suggestion in this case that any member of the Bureau is prepared to break that protocol in retaliation for these plaintiffs' actions. Instead, the plaintiffs suggest three related theories as to the adverse employment action they have suffered. In sum, those three are: denial of overtime opportunities, denial of

---

[22] Doc. 43-1 at 12. As will be discussed in more detail throughout this Order & Reasons, all three Plaintiffs are in positions where their promotion is based on availability and seniority, in that order, subject only to a passing test score. As of the time of these pleadings, it appears that all three Plaintiffs have test scores sufficient to be promoted.

[23] Alvarado v. Texas Rangers, 492 F.3d 605, 612 (5th Cir. 2007).

[24] All three plaintiffs are currently in the role of Communications Officer II. The next highest position within their line of progression, which is also the terminal position in this line, is Fire Communications Supervisor. This position is currently held by Mr. Alleman. Ms. Mitchell currently has seniority should Mr. Alleman resign or be removed, followed by Ms. Burkett, then a woman not party to this lawsuit, then Ms. Cavanaugh. Doc. 49 at 2.

[25] Additionally, one member of this lawsuit, Ms. Cavanaugh, was promoted to Communications Officer II due to her seniority during the pendency of this litigation.

proper training, and the vague threat of a future failure to be confirmed to a promotional position.[26]

**A. Denial of Overtime Opportunities**

Plaintiffs' primary contention is that they have been denied overtime opportunities in the form of training on the Computer Aided Dispatch ("CAD") File Maintenance system. The CAD system came into use in Jefferson Parish in or around 2010, and Mike Alleman, who is now in the role of Fire Communications Supervisor, was the first employee to be trained to maintain the system. The Fire Communications Supervisor is now responsible for maintaining the CAD system, and also serves as the direct supervisor for the three plaintiffs in their current role. All communications officers at Fire Alarm use the CAD system, but all parties agree that maintenance of the system is not within the ordinary job responsibilities of the communications officers. Plaintiffs contend that they have been denied overtime opportunities associated with CAD system maintenance that were offered to at least one similarly situated male comparator, resulting in an effect to their compensation that they claim constitutes an adverse employment action under relevant case law.[27]

The Fifth Circuit has noted that "no precedential authority in our circuit establishing whether a denial of overtime constitutes an adverse employment

---

[26] In their opposition to this motion, Plaintiffs most directly advance only the first theory, that of a denial of overtime opportunities. However, all three are raised in part or in whole throughout the opposition and justify discussion.

[27] See Tyler v. Union Oil Co. of California, 304 F.3d 379, 397 (5th Cir. 2002) ("An act affecting compensation is itself a type of adverse employment action that is actionable in a discrimination case").

action."[28] In one unpublished decision, the Fifth Circuit held that "[d]enial of overtime pay is an adverse employment action because it relates to [the plaintiff's] compensation."[29] In another unpublished decision, however, the Fifth declined to even address a plaintiff's claim that denial of overtime opportunities constituted an adverse employment action, saying: "Adverse employment actions are defined as 'ultimate employment decisions,' such as 'hiring, granting leave, discharging, promoting and compensating.' None of [the plaintiff's] allegations constitute an ultimate employment decision."[30] There is no suggestion that these plaintiffs have been adversely affected by an "ultimate employment decision." Further, in the unpublished Fifth Circuit decision in which denial of overtime opportunities was found to be an adverse employment decision, the plaintiff's employment status was changed from "overtime non-exempt" to "overtime exempt," such that he was no longer eligible for any overtime pay.[31]

That is not the case here: the plaintiffs in this case have had and continue to have opportunity for overtime. Ms. Burkett testified that she does not recall having ever been denied an opportunity to work overtime.[32] Ms. Mitchell took overtime more consistently than almost any other employee.[33] And after Ms. Cavanaugh raised this very issue – that she was being denied

---

[28] Brooks v. Firestone Polymers, L.L.C., 640 Fed. Appx. 393, 397 (5th Cir. 2016).
[29] Johnson v. Manpower Prof'l Servs., 442 Fed. Appx. 977, 982 (5th Cir. 2011).
[30] Hart v. Life Care Ctr. of Plano, 243 Fed. Appx. 816, 818 (5th Cir. 2007) (quoting Walker v. Thompson, 214 F.3d 615, 629 (5th Cir. 2000)).
[31] Johnson, 442 Fed. Appx. at 979.
[32] Doc. 43-11 at 15.
[33] Doc. 43-8, p. 64-65.

8

overtime opportunities available to a male colleague (Mr. Alleman) who was teaching classes on the CAD system – she was offered an opportunity to create and teach a class for overtime pay.[34] She declined.[35] Simply put, even if plaintiffs were denied particular overtime opportunities associated with the CAD system,[36] it does not appear that their compensation was affected by this denial, as they were presented with sufficient other opportunities for other overtime if desired.

### B. Denial of Proper Training

Alternatively, plaintiffs suggest that the denial of CAD systems training itself constitutes an adverse employment action. The parties all agree that CAD systems maintenance is not within the ordinary job responsibility of any of the three plaintiffs to this case. As such, Fifth Circuit case law dictates that any such denial does not constitute an adverse employment action.[37] Denial of training is not generally considered an adverse employment decision when it does not affect an employee's employment status or benefits: "there is no reasonable basis on which to conclude that a denial of such training, so peripheral to [plaintiff's] main duties … , would 'tend to' result in a change of employment status, benefits or responsibilities. Thus a denial of such training

---

[34] Doc. 43-3 at 15.

[35] Id. at 16.

[36] The Court does not here decide whether or not such a denial occurred.

[37] Again, the Court is not convinced that plaintiffs have indeed been denied this training. Defendants note in their reply brief that plaintiffs have, in fact, been trained in two of the three main aspects of CAD maintenance. Doc. 52 at 1. Moreover, two of the three plaintiffs are currently on extended paid leave due to the Covid-19 pandemic, and Mr. Alleman has testified that he intends to train them on the third aspect when they return. Doc. 43-12 at 15.

is not an adverse employment action covered by Title VII."[38] So also in this case.

### C. Future Failure to Confirm

Finally, plaintiffs suggest that they will be denied confirmation into any future positions to which they are promoted because of their lack of training. For positions within the Bureau to which individuals are promoted on the basis of seniority, those individuals are given a probationary period of six months to one year, after which they must be confirmed by the Fire Chief.[39] To the extent that any of these plaintiffs are not confirmed to a future position, that would constitute an adverse employment decision. As of now, however, no such event has occurred.[40] A potential adverse action in the future does not suffice to bring a Title VII case in the present.

## II. Showing of Disparate Treatment

As the only other current Communications Officer II besides these plaintiffs is also a female, finding a comparator is difficult. However, to the extent Daniel Wedge is a comparator, there is at least a colorable argument that he was treated differently than these plaintiffs. Generally, "employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job

---

[38] Shackelford v. DeLoitte & Touche, LLP, 190 F.3d 398, 407 (5th Cir. 1999) (internal citations omitted).

[39] Doc. 49 at 3. Chief Tibbetts suggested he would rely on the recommendation of Mr. Funk, the current Chief of Administration in deciding whether or not to confirm a Fire Communications Supervisor.

[40] One Plaintiff, Ms. Cavanaugh, is currently in a probational period for the role of Communications Officer II. Her supervisor, Mr. Alleman, has testified that he would confirm her "now" if it were in his power, as "she's excellent at her job." Doc. 43-12 at 25.

or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories."[41] While Mr. Wedge was a Communications Officer I and two of these plaintiffs were Communications Officer IIs, their job responsibilities were similar enough that the Court finds that they can be compared.[42] And while plaintiffs were trained in only two of the three main aspects of CAD system maintenance, Mr. Wedge was trained in all three. Further, "the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions."[43] In this case, the Bureau suggests that Mr. Wedge was offered additional training in CAD system maintenance because he asked for it, and that the disparate treatment therefore resulted from a difference in curiosity.[44] However, it is clear that at least Ms. Burkett asked to be trained in the CAD system, and all three plaintiffs explicitly asked for additional training opportunities.[45] At the very least, then, a material dispute of fact exists as to whether or not plaintiffs can show disparate treatment. However, as the plaintiffs cannot show an adverse employment action, they cannot survive summary judgment.[46]

---

[41] Lee v. Kan. City S. Ry. Co, 574 F.3d 253, 260 (5th Cir. 2009).

[42] Mr. Wedge has, during the pendency of this litigation, left the Bureau for other work as a firefighter.

[43] Id. at 260

[44] Doc. 49 at 7-8.

[45] Id.

[46] If the plaintiffs had been able to make a *prima facie* case of discrimination, "the burden of production [would have] shift[ed] to the employer, who must offer an alternative non-discriminatory explanation for the adverse employment action." Lee, 574 F.3d at 259. "If the

### III. Claim for Hostile Work Environment

A plaintiff proves a *prima facie* case for a hostile work environment by showing "(1) she is member of a protected group; (2) she was the victim of uninvited sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a 'term, condition, or privilege' of [her] employment; and (5) her employer knew or should have known of the harassment and failed to take prompt remedial action."[47] The Court finds that none of these plaintiffs allege that they were direct victims of uninvited sexual harassment. Plaintiffs discuss several unprofessional and sexually tinged comments made by other employees within the building but do not assert that any of the three plaintiffs were themselves the victims of uninvited sexual harassment. As such, plaintiffs have failed to carry their burden and cannot demonstrate a hostile work environment.

### IV. Claim for Title VII Retaliation

"To establish a prima facie case of retaliation under Title VII, [a plaintiff] must show that (1) she engaged in a Title VII protected activity; (2) she was subject to an adverse employment action; and (3) there was a but-for causal connection between her employment in the protected activity and the adverse employment action."[48] As the Court finds that the plaintiffs suffered no adverse employment decision, there can be no claim for retaliation.

---

employer can provide a legitimate nondiscriminatory explanation, the inference of discrimination drops out and the burden shifts back to the employee to demonstrate that the employer's explanation is merely a pretext for … bias." The Court does not reach a conclusion on pretext as it is not necessary to decide this motion.

[47] Harvill v. Westward Commc'ns, L.L.C., 433 F.3d 428, 434 (5th Cir. 2005).

[48] Harville v. City of Houston, 945 F.3d 870, 879 (5th Cir. 2019) (citation omitted).

## V. Alternative Request for Additional Discovery

In their opposition, plaintiffs request that, if this Court is inclined to grant this motion for summary judgment, it defer from doing so in order to allow plaintiffs to pursue further discovery occasioned by the revelation that some unknown number of emails were accidentally omitted from initial productions. The Court is skeptical that the probative value of re-running all search terms outweighs the costs of such an action but is reluctant to make a ruling either way without the benefit of full briefing occasioned by a contested motion. The Court's skepticism is bolstered by plaintiffs' counsel's declaration that "the relevancy of [the newly discovered emails thus uncovered] appear[s] to be minimal."[49] Moreover, the discovery deadline in this case was nearly two months ago,[50] and plaintiffs have neither filed a motion to compel nor described with particularity what it is they seek in additional discovery. While plaintiffs describe their request as a "limited" request, they seem to seek a full re-opening of electronic discovery. The Court declines to do so.

## CONCLUSION

Plaintiffs have been working in an uncomfortable environment. But not all discomfort is actionable. Were one of these plaintiffs to have not been confirmed to a position to which she was promoted, this case would doubtless be very different. As it stands, plaintiffs have failed to show an actionable adverse employment action and have not demonstrated that the potentially

---

[49] Doc. 49-19 at 2.
[50] Doc. 35.

adverse employment actions resulted in disparate treatment. As such, and barring some future adverse action, their claims must fail.

For the foregoing reasons, defendants' motion for summary judgment is **GRANTED**, and all remaining claims are **DISMISSED WITH PREJUDICE**.


New Orleans, Louisiana this 1st day of April, 2022


**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**